## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOE MAZZEO, individually on behalf of himself and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br>    v.<br>THANG BOTANICALS, INC., and FTLS HOLDINGS LLC, collectively doing business as 7ΩHMZ, and DOES 1-10, inclusive,<br><br>              Defendants. | Civil Action No: 1:25-cv-04393<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joe Mazzeo ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants Thang Botanicals, Inc. (d/b/a 7ΩHMZ, 7-OHMZ, or 7OHMZ ("Thang")) and FTLS Holdings, LLC ("FTLS") (collectively, "Defendants" or "7-OHMZ") and Does 1 through 10, inclusive.

## NATURE OF THE ACTION

1.      This is a civil class action against Defendants for their false, misleading, deceptive, and negligent sales practices regarding their 7-Hydroxymitragynine ("7-OH") tablet products (collectively, the "7-OH Products" or the "7-OH Tablets"). 7-OH is an alkaloid (psychoactive chemical) found in the kratom plant (*mitragyna speciosa*). Kratom is both a plant and a drug. The plant originates from Southeast Asia where its leaves have long been ingested to produce stimulant and opiate-like effects. Use of kratom in the United States was practically non-existent until the last decade. Since then, Kratom has become a massively popular substance in the United States. This is because it is currently legal to consume, and because of the stimulant and opiate-like effects produced by its two major alkaloids: 7-OH and Mitragynine.

2.      However, what consumers do not know is that the opiate-like effects produced by Mitragynine and 7-OH are not the result of novel chemical interactions in the brain.  Rather, these alkaloids are behaving, in part, exactly like opioids.  That is, the Mitragynine and 7-OH found in the kratom plant activate the same opioid receptors in the human brain as morphine, heroin, and other opiates.  Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects.

3.      But it gets worse.  While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than mitragynine.  Indeed, some studies have shown that 7-OH is potentially more potent than morphine in activating the mu-opioid receptor, which is the receptor associated most strongly with opioid addiction.

4.      In raw kratom though, 7-OH does not appear in great quantities, making up less than 0.05% of kratom powder by weight.  For raw kratom powder consumers this means that normal doses of kratom powder do not contain enough 7-OH to produce the intense narcotic effects (and concomitantly strong withdrawals) characteristic of traditional opioids.  This is not to say that kratom can be consumed with abandon—kratom is highly addictive and will induce opioid withdrawal symptoms if taken too frequently—rather, this is to say that in comparison to raw kratom addiction, the withdrawal symptoms from pure 7-OH consumption would be substantially worse.

5.      Defendants do not sell raw kratom.  Defendants' Tablets are pure 7-Hydroxymitragynine.  14mg of it to be precise.  This makes Defendants' 7-OH Tablets substantially more addictive than even kratom, and the withdrawal symptoms significantly worse.

6.      Almost as soon as Defendants' Tablets hit the market the horror stories began to surface.  Consumers stating that they were blindsided by these Tablets, thinking they were just a different form of kratom, and suffering through the worst withdrawal symptoms they had ever experienced – worse than heroin by some accounts.

7.    The general public is largely unaware of kratom and its addictive potential.  So, when it comes to "7-Hydroxymitragynine," a derivative of kratom with a tortuously complex name, the public is even less aware of it and its negative effects.

8.    When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine; they do not think of 7-OH Tablets or expect the "kratom alkaloid" product sold at their local gas stations or corner stores to act like an opioid or have the same addiction and dependency risks as opioids.  7-OH is extremely addictive and, as a result, tens of thousands of unsuspecting consumers have developed 7-OH dependencies that cause them serious physical, psychological, and financial harm.

9.    Defendants have intentionally failed to disclose these material facts regarding the dangers of 7-OH consumption anywhere on its 7-OH Tablets' labeling, packaging, or marketing material.  As a result, Defendants have violated warranty law and state consumer protection laws.

10.    Defendants rely on their Products' vague packaging and consumers' limited knowledge of 7-Hydroxymytragynine to get unsuspecting people addicted to their Products and reap substantial profits from these addictions.  Defendants rely on this ignorance and do nothing to correct it.  Such activity is outrageous and is contrary to New York law and public policy.

11.    Plaintiff seeks relief in this action individually, and as a class action, on behalf of similarly situated purchasers of Defendants' Products, for the following violations of: (i) Violation of New York's Consumer Protection from Dceptive Acts and Practices Act, N.Y.  Gen. Bus. Law §§ 349, *et seq*.; (ii) Violation of New York False Advertising Act ("NYFAA") N.Y. Gen. Bus. Law §§ 350, *et seq*.: and (iii) Fraud by Omission.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Class (defined below), exclusive of interest and

costs, exceed the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed Class, have a different state citizenship from Defendants.

13.     This Court has personal jurisdiction over Defendants because Defendants are entities with constitutionally sufficient contacts within this District to make personal jurisdiction in this Court proper.

14.     Venue is proper in this District because at least one of the Plaintiff was harmed by Defendants' actions in this District and because the transactions for the purchase of Defendants' products were made in this District.

## GENERAL ALLEGATIONS

**A.     Background and Pharmacology of Kratom and 7-Hydroxymitragynine**

15.     "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

16.     Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[1]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

17.     Kratom's unknown and inconsistent effects have historically been part of its appeal. For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect

---

[1] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

18.     In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

19.     To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[2]

20.     The chemicals in the kratom plant which produce a psychoactive effect when ingested are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds. The primary alkaloids in kratom leaves responsible for the kratom's effects are mitragynine ("MG") and 7-Hydroxymitragynine ("7-OH").

21.     MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

22.     Defendants' Products are unique as compared to most other kratom products on the market and represent a "next gen" iteration of the substance in terms of addictiveness and harm-potential.

23.     In other words, in raw kratom, 7-OH typically only occurs in doses which are no greater than 2% of total alkaloid content (or 0.05% by weight).  7-OH is different than MG because,

---

[2] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

although both interact with the mu-opioid receptor,[3] MG has a dramatically lower affinity for the mu-opioid receptor, whereas 7-OH has an affinity for the mu-opioid receptor which is comparable to—or greater than—opioids like Percocet, morphine, and oxycontin. Studies have shown that when 7-OH is administered in concentrated, isolated, doses it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom. Yet, consumers are largely ignorant of this fact.

24.    For instance, while both 7-OH and MG target the opioid-receptors, 7-OH's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.[4] Both MG and 7-OH were found to be more potent to the mu-opioid receptor than morphine when taken via oral administration.

25.    Accordingly, kratom products are referred to as opioids by health professionals because of their interactions with the mu-opioid receptor. This is doubly true of 7-OH, which interacts solely and more intensely with the mu-opioid receptor.

26.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug. The tragedy of addiction is that users want to stop but cannot.

27.    All substances that act on the opioid receptors have a high risk of addiction, and 7-OH is no exception. Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had. As these doses increase, the

---

[3] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia. For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

[4] *Kratom—Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

body becomes dependent on the drug to feel normal and function properly. When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs. Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

28.    Indeed, 7-OH withdrawal symptoms are very similar to those of traditional opioid withdrawal. These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

29.    Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal. Use is no longer about getting high, but about not feeling "sick."

**B.    Kratom and 7-OH Use and Addiction in the United States**

30.    Over the past decade, kratom has exploded in popularity within the United States. As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States. Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

31.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

32.    7-OH is new to the market having only arrived in 2022 or even more recently. Defendants' Products, for instance, came to market in 2023.

33.    Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.  This is doubly true of 7-OH.  Even if consumers have heard of kratom they may not have heard of 7-OH.

34.    7-OH sellers advertise it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day.  Some even assure consumers that 7-OH is a non-addictive way to deal with opioid withdrawal.  These 7-OH companies universally reiterate these purported "benefits" of 7-OH consumption, without disclosing any of the corresponding harms of 7-OH use.

35.    As a result of 7-OH manufacturers', retailers', and advertisers' failure to warn consumers of 7-OH's addictive potential, many 7-OH users find themselves blindsided when they stop taking 7-OH and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because 7-OH is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid.  Some 7-OH users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

36.    The reports from addicted 7-OH users are heart-wrenching.  Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to 7-OH , how difficult it was to stop their 7-OH use.  Below are several accounts from the "QuittingKratom" forum on www.reddit.com, which has over 45,000 members as of September 2024:[5]

---

[5] *See* https://www.reddit.com/r/quittingkratom.

i.    In one post titled **Beware of 7-Hydroxymitragynine,** a user wrote**:** I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like 7Ohmz might be tempting, and it is incredible for pain, but it threw me into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using 7ohmz though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

        a.    **Another user responded**: I don't know how you're cold turkey from the 7Ohmz, I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The 7ohmz withdrawal is very scary, worse than any opiate I've been on.

        b.    **Another User Responded**: I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

ii.    In separate post titled **7ohmz,** another user wrote: Guys I desperately need help. I have been taking 7 Ohmz for maybe 6 months. Like more than three a day. The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them. I am going across the country tomorrow and am going to be CT for 8 days. I actually really want to stop and I've been trying to for a really long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about these things. I'm really worried about my mental health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

iii.    In another post titled **Could not and would not believe you all...**another user wrote: Long time lurker, first time poster. I went CT three days ago... after using for 1 1/2 years. The last 3 months I've been exclusively abusing the 7-Ohmz tablets, a full pack of three a day. I told myself you were all exaggerating. I told myself you were all weak. Now I'm completely humbled and fully ashamed.  The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets...during the day I feel like a walking corpse.  And I caved.  I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move...I'm truly ashamed.  I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine...I can handle the WD whenever I decide or if I ever stop."  I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time I quit I need to be more prepared.  If you abuse it the way I do...Kratom is robbing you of life, and you trade it

willingly for a 2 hour high.  There's so much more to life than getting high.  Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏🏻

37.    Other experiences with kratom (not necessarily 7-OH products) described on the subreddit are similarly horrifying:

i.   **One user wrote:** I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

ii.   **Another user shared:** I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

iii.   **Another user shared:** I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly…  Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

38.    This Internet forum is filled with other accounts like these, and the stories are consistently the same – well-meaning people were looking to feel better by taking with what they thought was an "herbal supplement," only to develop an opioid-like addiction.  This anecdotal evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.  However, Defendants' Products have no information whatsoever warning that 7-OH is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

39.    Consumers who knew the truth about 7-OH may not have purchased Defendants' Products or would have paid less than they did for them.

**C.    Defendants Knew or Should Have Known they were Selling a Highly Addictive Drug to Unsuspecting Consumers**

40.    Defendants manufacture their 7-OH Tablets in a highly specialized lab and utilize highly technical knowledge about kratom and its alkaloids to synthesize their Products.  Thus, Defendants are acutely aware of the addiction risks posed by their Products.[6]

41.    Despite this knowledge, Defendants failed to disclose 7-OH's addictive potential to their customers on their Products' packaging.

42.    Defendants have no excuse for their lack of a detailed disclaimer warning on their 7-OH Tablet's packaging of 7-OH's harms.  The pharmacological effects of 7-OH have been thoroughly studied, and it is well-established that 7-OH acts on the same mu-opioid receptors in

---

[6] Indeed, in an appearance on The Kratom Advocacy Podcast on September 9, 2024, Gregory Dalli (CFO for both Defendants 7OHMZ and FTLS Holdings) stated that "7-Hydroxymitragynine in specific is a really perfect key for the MU opioid receptor, and the reason why that is such an important thing is you don't need to take as much of it to get an effect versus if you look at morphine."  *See*  https://www.youtube.com/watch?v=8lBSL_HTW4I at 3 minutes and 10 seconds.

the brain as traditional opioids do.  Further, there are widespread reports and studies of other

addiction and dependency issues.[7]

43.    Defendants therefore know or should have known that 7-OH users can develop an

addiction or become physically dependent on its Products.  Yet, Defendants fail to disclose this

material fact on their advertisements or on their Products' packaging.

44.    The very fact that Defendants possesses the capability to manufacture their 7-OH

Tablets shows that it understands the pharmacokinetic nature of 7-OH and the substantial risk of

addiction that it poses to consumers.  Despite this, Defendants market their 7-OH Products as if

they are nothing more than over-the-counter supplements.  Indeed, the packaging looks more like

allergy medication than a dangerously strong opioid, and Defendants' glossy website and design

language obfuscates the very real truth that it is selling a strong narcotic to consumers who likely

do not fully comprehend the risks associated with consuming the Products.

45.    For instance, in the image pictured below, taken from Defendants' website,

Defendants gives customers a wink and a nod that 7-OH is "known for its unique effects" which

"interacts with receptors in an interesting way."  While some customers who have experience with

Defendants' Products may have a sense for what this means, regular consumers do not.  Like



[7] In that same podcast interview, Gregory Dalli is informed by the interviewer that consumers
have stated the Product "has ruined [their] li[v]e[s]."  The interviewer then informs Gregory that
he has tried Defendants' 7-OH Product and can see how one can get addicted to it.  *Id.* at 28
minutes and 55 seconds.

12

Plaintiff's experience described below, consumers may walk into the local headshop and see Defendants' Product and be enticed into purchasing it because, they think, it looks inviting and if it was dangerous there would be a warning on the package.



46.     It gets worse.  Just like a street-level drug dealer might do, Defendants have authorized stores, and in some cases, instructed them, to give the tablets out as free samples.  The sample pictured below was found by Plaintiff's counsel in a 7ΩHMZ-branded "free sample" box. This sample bears zero warning that the Product interacts with the *opioid* receptors, that it is substantially more addictive than kratom, or that continued use may result in severe withdrawal symptoms.  The very act of giving out "free samples" is a signal to consumers that the Product is safe and harmless.  Without the warning, consumers have no reason not to try the sample.  They may even enjoy the effects and continue using the Product because they do not believe a Product with such substantial addictive potential would not bear some kind of warning.  This is outrageous, a moral and ethical failure, and in contravention of public policy.

47.     Reasonable consumers looking at the Products' packaging and online store description would not presume that 7-OH is highly addictive.

48.     Nowhere on the packaging do Defendants mention that 7-OH presents the same addiction problems that former opioid users and any other consumers would want to avoid. Consumers seeking help as they come off opioids may be drawn in by Defendants' misleading statements about 7-OH without knowing that they risk trading one addiction for another.

49.     As a 7-OH product seller, manufacturer and/or distributor, Defendants occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about 7-OH.

50.     The information provided on Defendants' Products' packaging in particular is woefully sparse.  Another representative image of one of Defendants' Products is depicted below, along with the back of the package description as it existed at the time of Plaintiff's purchases:





51.     The furthest Defendants go in disclosing any negative side effects is a generic warning buried in the middle of the fine print which reads "this product may be harmful to your health."  Such a vague and inconspicuous disclaimer is wholly insufficient to put consumers on notice that the Product is in fact habit-forming and that repeated use can lead to physical dependence and addiction with opioid-like withdrawal symptoms.

52.     Any consumer who even manages to spot this miniscule throw-away line buried in the middle of fine-print would still not be adequately informed about the serious risks associated with use of Defendant's 7-OH Products.

53.     At the end of the fine print, consumers are advised to visit Defendant's disclaimer page on its website, where passing references to addiction are actually made.   However, as evidenced by the image below, such a warning is once again buried in microscopic fine print and woefully easy to miss.



54.    Furthermore, the website disclaimer must be evaluated in the purchasing context: typically, a gas station or a corner store.  No reasonable consumer standing in front of the teller at such a store would see this link on the back of the package, pull out their phone (if they have one), go to the website, zoom in on the block of text and then scrutinize every word (if their vision even permits it) of what appears on its face to be a bog-standard legal disclaimer.[8]  The risk of opioid-like dependence and withdrawal is far too serious to be relegated to the middle of a website disclaimer which requires a microscope to read.  The seriousness of the risks involved with consuming Defendants' Products demands prominent warnings on the physical packaging.

55.    On Defendants' website homepage, they market their 7-OH Tablets with the following:

> Introducing our new 7-Hydroxymitragynine tablets! Discover the natural wonder of 7-OHM, an active metabolite derived from the Kratom leaf. This remarkable terpenoid indole alkaloid, known for its unique effects, can provide you with a potentially enjoyable experience. Derived from the Kratom plant and often referred to as '7-OHM,' this unique compound interacts with receptors in an interesting way.

56.    Additionally, Defendants' website's homepage has a section called "What is 7-OHM?" that contains the following description:

> 7-Hydroxymitragynine is a terpenoid indole alkaloid from the plant Mitragyna speciosa, commonly known as Kratom. It is often referred to as '7-OHM. It was first described in 1994 and is a natural product derived from the mitragynine present in the Kratom leaf. It is considered an oxidized derivative and active metabolite of mitragynine. 7-OHM binds to opioid receptors like mitragynine, but research suggests that 7-OHM binds with greater potency and contributes heavily to the analgesic activity of mitragynine as a metabolite.

57.    In this description, Defendants admit that their 7-OH Products contain the more potent and more harmful kratom alkaloid (7-OH), instead of the less potent form (MG), but Defendants fail to disclose on the Products' packaging the heightened harm that corresponds with the increased potency of their 7-OH Products.

---

[8] Plaintiff did not visit the website and did not see the website disclaimer either.

58.     Despite these "informative" introductions to their Products, nowhere in any of these disclaimers or descriptions (aside from the specific disclaimer page discussed above) do Defendants provide any warning to consumers on the Products' packaging that their Products interact with opioid receptors or are highly addictive and should not be taken daily or note any of the numerous negative side effects and withdrawal symptoms caused by their Products.

59.     Indeed, the entire contents of the warning on the Products' packaging is a bog-standard disclaimer—written in miniscule text—that consumers should consult a healthcare professional before use and that Defendants are not liable for "misuse of this Product."  The warning then directs consumers to a legal disclaimer page on Defendants' website.

60.     A boilerplate disclaimer and suggestion that consumers check out a website is plainly insufficient.  This is a Product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

61.     Addiction is a disease.  As such Defendants' 7-OH Tablets pose an unreasonable health hazard, and Defendants had and have a duty to disclose this fact *on their Products' packaging.*

62.     What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.  It looks as innocuous as a vitamin supplement.

63.     Defendants, through their misleading advertising and their failure to disclose 7-OH's addictive properties on their Products' labels, relied upon the average consumer's incomplete knowledge of 7-OH to better sell their Products and get users addicted to them.

64.     Defendants fail to disclose 7-OH's addictive potential because Defendants know that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendants' financial detriment.

65.     By any metric, Defendants' conduct is immoral, unethical, and contrary to New York public policy.

66.     The United States is going through an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendants are creating more addicts for no reason other than to line their pockets, without adequate disclosure of their Products' risks through the use of false and misleading packaging and marketing.  That cannot– and should not–stand, at least when Defendants' conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

### PARTIES

67.     Plaintiff Joe Mazzeo ("Mazzeo") resides in Latham, New York and intends to stay there.  Mazzeo first learned about 7-OH/7OHMZ in 2023 when he was given a sample at a smoke shop in Baldwin, New York.  He observed that the packaging did not mention any risks of potential harm. In fact, Plaintiff was told it was an herbal supplement.  Plaintiff slowly realized the frequency of purchases over time got greater.  When trying to quit using Defendants' Products, the withdrawal symptoms he experienced included, but were not limited to, anxiety, depression, sleep issues, flu-like aches and pains, and panic attacks.  He has recently succeeded in ceasing to take the product.  To accomplish this, Plaintiff literally had to move out New York City to get away from Defendant's Products.  Had he known that Defendants' Product was highly addictive, by way of a warning on the Product's packaging, he would have never purchased it.  All of Plaintiff's purchases took place in Baldwin and Freeport, New York.

68.     Defendant Thang Botanicals, Inc., d/b/a 7ΩHMZ, is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Thang owns and operates the 7-OHMZ website, www.7ohmz.com, and also advertises, markets, distributes, and sells its 7-OHMZ Products in New York, and throughout the United States.

69.     Defendant FTLS Holdings, LLC is a Delaware entity with its principal place of business in San Francisco, California.  Defendant FTLS Holdings, LLC owns the trademark for the "7ΩHMZ" brand.  Defendant FTLS Holdings, LLC is owned and operated by Gregory Dalli, who is also the CFO of Defendant Thang Botanicals/7ΩHMZ. FTLS and Thang/7ΩHMZ operate in furtherance of a single enterprise and are so financially intertwined as to be considered one and the same entity for purposes of this lawsuit.

70.     Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-10, inclusive, and therefore sue such Defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe Defendants are, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed Class as alleged herein.  Plaintiff reserves the right to amend this Complaint to set forth the true names and capacities of these Defendants when they are ascertained, along with appropriate charging allegations, as may be necessary.

## CLASS ALLEGATIONS

Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other Class members, defined as follows:

> All persons who, within the applicable statute of limitations period, purchased 7-OHMZ 7-hydroxymitragynine products while in New York (the "New York Class").

71.     Excluded from the Class are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action.  Plaintiff reserves the right to expand, limit, modify, or amend the Class definition, including the addition of one or more subclasses, in connection with his motion for Class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

72.    ***Numerosity***: The members of the Class are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains at least thousands of consumers throughout New York who have been damaged by Defendants' conduct as alleged herein. The precise number of members of the Class is unknown to Plaintiff at this time.

73.    ***Existence and Predominance of Common Questions of Law and Fact***:    This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Class.  These common legal and factual questions include, but are not limited to, the following:

      a.    whether the labels on Defendants' Products have the capacity to mislead reasonable consumers;

      b.    whether Defendants knew that 7-OH is a highly addictive substance that causes physical and psychological dependence and opioid-like withdrawal symptoms;

      c.    whether Defendants' conduct alleged herein violated the NYDAPA, and/or NYFAA;

      d.    whether Defendants' conduct constitutes a fraudulent omission; and

      e.    whether Plaintiff and the Class are entitled to damages and/or restitution.

74.    ***Typicality***: Plaintiff's claims are typical of the claims of the Class in that Plaintiff and the Class members sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' failure to inform Plaintiff and all others similarly situated that their Products are highly addictive and akin to opioids.

75.    ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no antagonistic or adverse interests to those of the Class.

76.    ***Superiority***: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of

individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

77.    Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiff, members of the Class, and the general public—who are also negatively impacted by addiction—and will likely retain the benefits of Defendants wrongdoing.

78.    Based on the forgoing allegations, Plaintiff's claims for relief include those set forth below.

79.    Plaintiff is informed that Defendants keeps extensive computerized records through their online sales data, as well as through, *inter alia*, general marketing programs.  Defendants have one or more databases through which a significant majority of members of the Class may be identified and ascertained, and Defendants maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

### FIRST COUNT
**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act ("NYDAPA")**
**N.Y. Gen. Bus. Law §§ 349, *et seq.***

76.    Plaintiff Mazzeo realleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

77.    Plaintiff Mazzeo brings this claim individually and on behalf of the members of the proposed New York Class against Defendants.

78.    This claim is brought pursuant to the laws of the State of New York. NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

79.    Plaintiff Mazzeo. and members of the New York Class are "persons" under the NYDAPA, N.Y. Gen. Bus. Law § 349(h), and Defendants' actions as set forth herein occurred in the conduct of "business, trade or commerce" under the NYDAPA.

80.    In the course of its business, Defendants marketed its 7-OH Products in such a way that gave consumers, including Plaintiff Mazzeo and members of the proposed New York Class, the impression that its Products were safe to consume and did not cause any opioid-like addiction and withdrawal symptoms; therefore, leading to the false impression that Defendants' Products were worth more than they actually were. In truth, the Products, as currently labeled and packaged, are worthless because of the unreasonable risk of addiction they pose.

81.    In all meaningful respects, Defendants' deceptive acts and practices were directed at consumers.

82.    Plaintiff Mazzeo and members of the proposed New York Class had no way of discerning the true addictive and harmful properties of Defendants' Products as a result of Defendants' materially misleading failure to disclose such risk. Information as to the potential addiction risks of their Products was in Defendants' exclusive control.  Plaintiff Mazzeo could not possibly have known that the Products at issue would pose a serious risk of addiction because such information was not reasonably available to the public.

83.    In other words, Defendants' deceptive acts and practices are materially misleading because they violate consumers' reasonable expectations that the Products would be appropriately packaged and labeled to the extent that they posed such an unreasonable safety hazard—i.e., serious risk of addiction and physical dependence. Instead, Defendants' statements, or lack thereof, on its Products' packaging and labels, when considered from the perspective of a reasonable consumer, give the false impression that Defendants' 7-OH Products are generally safe to consume and do not cause opioid-like effects and withdrawal symptoms. A reasonable consumer would

attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the Product.

84.    Defendants know that health information about their Product is material to consumers.  If such information were not material, Defendants would not market its Products as "all natural."  As a result of its deceptive acts and practices, Defendants sold tens, if not hundreds, of thousands of 7-OH Products to unsuspecting consumers across New York. Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that they were safe to consume regularly and did not pose a serious risk of addiction.

85.    Plaintiff Mazzeo and members of the proposed New York Class reasonably relied upon Defendants' misrepresentations and omissions when purchasing Defendants' 7-OH Products. Plaintiff Mazzeo and members of the proposed New York Class would not have purchased Defendants' Products but for Defendants' failure to disclose 7-OH's composition, addictive nature, and the negative side effects and withdrawal symptoms that would result from the use of Defendants' Products.

86.    Defendants knew or should have known that this conduct violated NYDAPA and Defendants owed a duty to Plaintiff Mazzeo and members of the proposed New York Class to refrain from engaging in such deceptive acts or practices, and to disclose the truth about the real risks from 7-OH, especially in its concentrated, or "extract," form.

87.    If Defendants had advertised its Products truthfully and in a non-misleading fashion, Plaintiff Mazzeo and other New York Class Members would not have purchased them.

88.    Defendants' violations of NYDAPA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that members of the proposed New York Class and the general public will be deceived into purchasing Products based on Defendants' misrepresentations and omissions regarding the purported "benefits" and actual harms posed by its 7-OH Products. These misrepresentations and/or omissions cause financial damage to

consumers, who would not have bought Defendants' Products had they known about their true addictive nature.

89.     As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' business, Plaintiff Mazzeo and members of the proposed New York Class suffered ascertainable loss and actual damages in that they would not have purchased the Products but for Defendants' misrepresentations and omissions concerning the addictive properties of its 7-OH Products.

90.     Plaintiff and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including but not limited to, recovery of actual damages and/or fifty dollars in statutory damages per violation (i.e., per unit sold), whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## SECOND COUNT
### Violation of New York False Advertising Act ("NYFAA")
### N.Y. Gen. Bus. Law §§ 350, et seq.

91.     Plaintiff Mazzeo realleges and reincorporates by reference all paragraphs alleged above.

92.     Plaintiff Mazzeo brings this claim individually and on behalf of the New York Class against Defendants.

93.     This claim is brought pursuant to the laws of the State of New York. The New York False Advertising Act ("NYFAA") makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350(a).

94.     Defendants' packaging, labeling and advertisement of their Products are materially misleading insofar as they fail to disclose or reveal the existence of the serious potential for addiction and/or opioid-like dependence.  By misrepresenting the true contents of the Products, Defendants' marketing and labeling misleads a reasonable consumer.

95.     Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

96.     Defendants had exclusive knowledge of the addictive nature of its Products.

97.     Defendants' misrepresentations and omissions were material because consumers are concerned with the safety of the Products they purchase and the nature of the ingredients therein, including the risk that the consumption of such Products will result in addiction and/or physical or psychological dependence.

98.     Defendants' materially misleading practices were likely to, and did, deceive reasonable consumers, including Plaintiff Mazzeo and members of the New York Class, about the real harmful nature of its 7-OH Products.  Plaintiff Mazzeo and members of the proposed New York Class reasonably relied upon Defendants' material omissions when purchasing Defendants' Products.

99.     Plaintiff Mazzeo and members of the proposed New York Class would not have purchased Defendants' Products but for Defendants' misrepresentations and omissions regarding the true nature of 7-OH and the effects of the ingredients in its 7-OH Products. In other words, Plaintiff Mazzeo and members of the New York Class would not have purchased the Products had they known that the Products posed such a serious risk for addiction.

100.    Defendants' violations of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that members of the proposed New York Class and the public will be deceived into purchasing Products based on Defendants'

misrepresentations and/or material omissions regarding the harmful and addictive nature of its Products. These misrepresentations and/or omissions by Defendants lead to financial damage for consumers like Plaintiff and members of the proposed New York Class.

101.    Plaintiff and members of the proposed New York Class are entitled to all the damages, remedies, fees, and costs available under the NYFAA, including, but not limited to, recovery of actual damages and/or $500 per violation (i.e., per unit sold), whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### THIRD COUNT
### Fraud by Omission

102.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

103.    Plaintiff brings this claim individually and on behalf of the New York Class against Defendants, under the laws of New York.

104.    Defendants misrepresented that its 7-OH Products have attributes or qualities that they do not have by failing to disclose that 7-OH is addictive and can cause opioid-like withdrawal.

105.    Defendants know that 7-OH is addictive because it interacts with 7-OH vendors and has been made aware of user reports.  It is also in Defendants' financial interest to know how addictive its Products are so that it can more reliably make revenue projections and otherwise predict cash flow.

106.    Defendants also know that knowledge of 7-OH's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

107.    The average reasonable consumer in the 7-OH purchasing context does not know that 7-OH is addictive and cannot reasonably access that information.

108.    Defendants therefore had a duty to Plaintiff and the members of the Class to disclose on its Products' packaging that 7-OH is addictive and can cause withdrawals.

109.    Consumers, including Plaintiff, reasonably and justifiably relied on Defendants' omission because it is reasonable to assume that a product which is addictive like a street or pharmaceutical opioid would bear a warning.

110.    As a result of Defendants' material omission, Plaintiff and the Class members paid for 7-OH Products they would not have purchased had they known the truth about the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, and on behalf of the Class, respectfully request this Court award relief against Defendants as follows:

a.   an order certifying the Class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b.   award Plaintiff and members of the Class actual, consequential, punitive, and statutory damages, as appropriate;

c.   award declaratory relief as permitted by law or equity, including directing Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

d.   award attorneys' fees and costs; and

e.   award any other further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 6, 2025                **BURSOR & FISHER, P.A.**

By:  */s/ Neal J. Deckant*
         Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com

*Attorneys for Plaintiff and
Proposed Class Counsel*